| | | |
|---|---|---|
| **Summons** | CIVIL DOCKET NO. 2284 cv 00472 | **Trial Court of Massachusetts** **The Superior Court** |

CASE NAME:

## *JERROLD G. NEEFF*
Plaintiff(s)

VS.

## *BOSTON UNIVERSITY ET.AL*
Defendant(s)

Michael Joseph Donovan          Clerk of Courts

Suffolk                                    County

COURT NAME & ADDRESS:

SUPERIOR CIVIL COURT
SUFFOLK COUNTY COURTHOUSE
THREE PEMBERTON SQ. 12th Floor
BOSTON, MASSACHUSETTS 02108

THIS SUMMONS IS DIRECTED TO *BOSTON UNIVERSITY* (Defendant's name)

*OFFICE OF GENERAL COUNSEL 125 BAY STATE ROAD BOSTON, MA 02215*

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the                    Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

      a) Filing your **signed original** response with the Clerk's Office for Civil Business,                    Court

               (address), by mail or in person **AND**

      b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
*JERROLD G. NEEFF/509 BEACON ST. BOSTON, MA 02215*

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

1

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger_____ , Chief Justice on _____ , 20____ . (Seal) .

Clerk-Magistrate _Michael Joseph Donovan_
    Michael Joseph Donovan

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

ALONG WITH PLAINTIFF'S RULE 36 REQUEST FOR ADMISSIONS.

Dated: _____          Signature: _____

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: 7/15/2022

## COUNTY OF SUFFOLK
## SUPERIOR COURT

| | | |
|---|---|---|
| PLAINTIFF, | ) | |
| JERROLD G. NEEFF, | ) | |
| A natural person and | ) | **2284cv00472** |
| Massachusetts resident. | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| DEFENDANTS, | ) | |
| BOSTON UNIVERSITY | ) | |
| A Massachusetts Corporation. | ) | |
| | ) | |
| AND, | ) | **AMENDED COMPLAINT** |
| | ) | |
| JUDITRA BURGESS, | ) | |
| A Massachusetts resident and | ) | |
| Employee of Boston University, | ) | |
| | ) | |
| AND, | ) | |
| | ) | |
| CHAOYI HOU, | ) | |
| A current Massachusetts resident. | ) | |

## SUMMARY

This is a Complaint for damages alleged against the Defendants for the Plaintiff's Suspension after one class while teaching at the School of Law at Boston University as an Adjunct Professor, a Position he has held for sixteen years. He now seeks compensation for the resulting damages sounding in Negligence, Defamation, Wrongful and Retaliatory Termination, Invasion of Privacy and violations of the Massachusetts Civil Rights Act. For the reasons set forth below, the Plaintiff, Professor now so pleads the following:

## PARTIES

1. The Plaintiff, Jerrold G. Neeff, (hereinafter referred to as "the Professor" and/or "the Plaintiff") is a resident of Massachusetts and duly admitted Attorney in the Commonwealth of Massachusetts, where he has been a member of the Massachusetts Bar for 24 years, a member of the Adjunct Faculty of the School of Law at Boston University for 16 years and currently resides at 509 Beacon St., Boston, MA 02215.

2. The Defendant, Juditra Burgess (hereinafter also referred to as "Burgess" and/or "Director Burgess"), upon information and belief is a Massachusetts resident, is a natural person, currently serving as the Director Labor Relations at Boston University School of Law with a business address located at 765 Commonwealth Ave., Boston, MA 02215.

3. The Defendant, Chaoyi Hou (hereinafter also referred to as "Defendant Hou" or "Hou"), upon information and belief, is an international student from China and a current student at Boston University School of Law in the American Law Program who currently resides in the Commonwealth of Massachusetts.

4. The Defendant, Boston University, is a Massachusetts Corporation with a corporate office and usual place of business located at 765 Commonwealth Ave., Boston, MA 02215 (hereinafter referred to as "BU" and "the University").

## BACKGROUND

5. The Professor is a 51 year old male, husband and father of a seven year old girl. He is an Attorney in the Commonwealth of Massachusetts and has been a member of the Massachusetts Bar for 24 years.  He is the Principal of a boutique law firm, the Bostonian Law Group, where he has specialized in IP, Employment and

**4**

Entertainment Litigation including, Business and Entertainment disputes,
Employment and Media, Trade Secret and Non-compete litigation and Copyright,
Trademark and Cyberlaw, counseling and representation.

6. During that time, the Professor has practiced before the United States Court of
   Appeals, the Massachusetts Court of Appeals, the United States District Courts of
   Massachusetts, the Business Litigation Section of the Superior Court of
   Massachusetts, the various Superior Courts of Massachusetts and the Federal Courts
   of New York, Connecticut and Indiana.

7. The Professor has been on the Adjunct Faculty at the School of Law at Boston
   University for 16 years.  During that time, he has taught more than 800 students and
   attorneys from more than 60 different countries from the US and Europe, to the
   Middle East, to South America, Australia and Asia.  For those students, he has written
   more than 100 recommendations and overseen approximately 15 Students' papers for
   certification for graduation completely voluntarily and without compensation.  To this
   day, he remains in close contact with 100s of former students, has worked with many
   of his former students, and continues to advise them on legal issues.

8. The Professor has served on numerous professional panels including as a Moderator
   on *Television and Film: focusing on the Future of the Music Industry*, 2017, Harvard
   Law School, *The Effects of Social Media on Sports and Entertainment Law*, the 2014
   HLS Symposium at Harvard Law School, featuring, among others, Executives from
   the D allas Cowboys, Sony and The Weinstein Company; Sports Agents and
   attorneys for various celebrities and athletes including Eric Hernandez, Alex

Rodriguez and Amanda Bynes and various other Hollywood Entertainment and Industry Professionals.

9. The Professor also served as a Moderator on the Panel on *New Media and Entertainment's Digital Future*, the 2012 HLS Entertainment Law Symposium on the Globalization of the Entertainment Industry, Harvard Law School, featuring, to note, the General Counsel and EVP of Corporate Operations of Lionsgate Entertainment (Hunger Games and Twilight), the VP of Legal Affairs of the MPAA, and the Senior VP of Worldwide Operations, Marketing and Distribution of the motion picture division for Sony Pictures Entertainment.

10. The Professor has appeared on the television programs *Celebrity Justice* and *Extra TV*, two syndicated shows featuring celebrity matters where he consulted on some high profile celebrity legal issues as well as CN8's *Nightbeat with Barry Nolan* and *WHDHtv* where he provided commentary on the effects of Napster, the expected ramifications of the DMCA and other elements related thereto as the digital age, development of technology and social media are changing the music industry. He has also appeared on *Fox 25 News*, to discuss the metaverse and evolving legal issues in the virtual and digital worlds, most pertinent to the class at issue in this case. Other matters handled by the Professor have been featured in the *Wall Street Journal*, *CNN*, *News of the World*, the *London Times*, the *London Daily Mirror*, *E! Entertainment*, *Court TV*, *Playboy Magazine*, *Star Magazine*, *People Magazine*, the *New York Daily News*, *Lawyers Weekly USA*, the *Boston Business Journal*, the *Boston Herald* and many other national publication.

## PREFACE

11. As noted above, the Professor has been a member of the Adjunct Faculty at Boston University for 16 years.  He has had nothing but excellent student reviews since he began working at the University. There had only been one year during the Covid pandemic in which the student reviews were neutral.  This was largely due to a dispute with the Administration in which the Professor disagreed with teaching in class for health and safety purposes (while no students wanted to be on campus).  In fact, at the time, the Dean of the School of Health at Boston University publicly stated that it was "inconceivable" that BU conduct any classes in person due to the threat of the Covid virus. Nonetheless, the implication was made by the Associate Dean at the time, that one would be terminated if not willing to teach in person regardless of personal health and safety concerns.

12. According to a student in the Professor's class, the University was trying to enforce Adjunct Faculty to be in class while students had the option of taking classes virtually.  It was the student's opinion that the University was trying to promote itself as one of the only law schools still having an "in-class" option so that the University could continue to raise tuition.  While other Universities were cutting tuition expenses during the initial stages of the Covid pandemic, Boston University was seeking to raise it at the risk of the health and safety of its Adjunct Faculty.  The University was callously forcing Adjunct Faculty to be in class in order to justify its increase in tuition at the expense of the potential health risks posed to the Adjunct faculty.  Much to the dismay and frustration of the BU Administration, BU was forced to provide a reasonable accommodation to the Professor when the Professor provided medical

documentation to the Associate Dean at the time confirming a disability preventing
him from wearing the mask, thus, necessitating teaching the class virtually.

## ADMINISTRATIVE LEAVE/ SUSPENSION

13. The Professor was retained by Boston University to teach two courses for the Fall of
    2021, Entertainment Law in the JD program and IP in the Digital Age in the LLM
    program. The LLM course was scheduled for Tuesdays while the Entertainment Law
    class was scheduled for Thursdays.

14. The first class, IP in the Digital Age, began on September 7, 2021 with the
    corresponding class, Entertainment Law being held on September 9, 2021.   From the
    perspective of the Professor, everything went excellent as these were the very first
    classes of the semester.

15. In fact, following the very first class for IP in the Digital Age, the Professor received
    the following E-mail from a student in the class:

    Abdulrahman (last name omitted)
    Thu 9/9/2021 1:13 PM
    To:
    Neeff, Jerrold Gustav
    Hello professor,

    I'm Abdulrahman (last name omitted) "Abdul " your LLM IP digital student. I
    wonder if you would an assistant in our class or any other class as a job. I've looking
    for that from last year but unfortunately there wasn't a chance.
    Thank you for your time **we enjoyed the class! (Emphasis added)**

Best regards,

Abdulrahman

16. Apparently, the student enjoyed the class so much along with his classmates he so mentions that he inquired as to the possibility of a Teacher's Assistant position in the Professor's class. The Professor immediately forwarded the E-mail to Director of the American Law Program, Maureen Leo (hereinafter also referred to as "the Administration" and "Leo") requesting instructions on how to direct the student's inquiry but received no response. That would be the only feedback the Professor would receive from a student from that class, however, as the Professor was shortly thereafter put on Administrative Leave/Suspension.

17. After brief correspondence between the Professor and members of the BU Administration, the Professor was put on Administrative Leave/Suspension on September 20th, 2021.

18. In particular, leading up to the Suspension, the Professor was informed that there had been student concerns provided to the Administration in the first class of IP in the Digital Age. When the Professor inquired about said concerns, Anna di Robilant, Associate Dean of Academic Affairs (hereinafter also referred to as "the Administration" and "di Robilant"), in her first year of said position, replied that there was a "lack of professionalism."

19. In fact, in the legal profession, the accusation of a "lack of professionalism" is akin to Bar Discipline or some type of extreme malfeasance, untoward behaviour or sexual or racial misconduct.

20. Shocked and deeply upset by the insinuation that the Professor had engaged in some form of a "lack of professionalism" in the single class held, the Professor asked for further qualification on the accusations.

21. When inquiring further, Anna di Robilant explained that there had been complaints about the Professor's attire and that he was tardy to the first day of class.

22. The Professor was shocked that these were the reasons cited for his alleged "lack of professionalism."  The Professor wore the same khaki shorts and polo shirt he had been wearing in the Fall Semester for the last 16 years (it was 90 degrees that day). Further, the collective bargaining agreement between the Adjunct Faculty and BU does not call for any dress code.

23. Also, while the Professor does not recall being tardy or not, this was the first class of the semester in a new room on a large campus.  At most, the Professor could have been a minute or two late.

24. On September 17, 2021, the Professor sent the following E-mail to Anna di Robilant:

Fri 9/17/2021 10:25 AM

To:

di Robilant, Anna

Good morning Anna,

To be perfectly honest, I am both shocked and upset by these accusations.  To the contrary, I could not have envisioned a better first week with both my classes.  I would suggest to anyone who doubts me to simply watch the videos.  In fact, I had several students in both classes approach me after the class to tell me how much they enjoyed it, both in person and via E-mail- even one student asking if he could serve as a TA for my IP course due to his enjoyment.

Th (sic) only thing really challenging is trying to identify students from the seating

charts because of the requirement to wear masks, but I always do so respectfully and

courteously.

Nonetheless, I understand protocol and can be available either Monday or Wednesday

afternoon.

Thanks and please let me know.  Have a nice weekend!

Best,

Jerry

25. Instead of scheduling an appointment to confer, on September 20, 2021, the very

Monday after the Professor sent the above E-mail, Anna di Robilant responded by

informing the Professor that he was placed on Administrative Leave effective

September 20, 2021, to investigate allegations of "misconduct" made by a student in

his class-presumably, his attire and tardiness.

26. Despite these allegations, following the Suspension of the Professor, there was an

unsolicited E-mail sent from a student in the Entertainment Law class praising the

Professor for his instruction.

27. Two classes were held in the Entertainment Law class before the Professor was put

on Suspension.  In fact, following the notice of Suspension, the Professor received the

following E-correspondence from a student:

Sungyeop (last name omitted)

Thu 9/23/2021 9:06 AM

To:

Neeff, Jerrold Gustav

Professor Neeff,

**Like the rest of the class**, I heard that you won't be teaching the class anymore due

to unforeseen circumstances.  **(Emphasis added)**.  While it's very unfortunate, I hope

you are okay! I really enjoyed your class and I loved the class discussions. I hope I

get to take another class of yours in the future!

Thank you for the fun class and I hope you have a great rest of your day,

Sungyeop (last name omitted)

J.D. Candidate

Boston University School of Law

28. The Professor did not respond to this E-mail as he thought it might be inappropriate

having been put on Suspended status.

29. Nonetheless, this was the unsolicited correspondence provided by students in both

classes indicating that both students and their classmates greatly enjoyed both classes.

## THE INVESTIGATION

30. On October 15th, 2021, a Memorandum was released and authored by Anna di

Robilant, Associate Dean of Academic Affairs, in her first year of said position,

Maureen Leo, Director of the American Law Program, in her first year of said

position and Ellen Frentzen, Assistant Dean of Administration and Director of

Library Services (hereinafter also referred to as "the Administration" and

"Frentzen").

31. Following the Suspension and placement of the Professor on Administrative Leave,

the University conducted an investigation of the Professor including interviews of

some students in the Professor's class, IP in the Digital Age, (the "Investigation").

32. Ultimately, the Administration concluded that the Suspension of the Professor was justified.

33. Despite the fact that the class, IP in the Digital Age, had 25 students enrolled, only 13 students were selectively interviewed by the aforementioned Defendants, all of whom, upon information and belief were visiting students from China.

34. Overwhelmingly, the primary concern cited by these students was that they had difficulty understanding the Professor.  In the last sixteen years of teaching at the University, however, not a single student had ever complained about being incapable of understanding the Professor.

35. One such student, Ke Xu stated the Professor "talked very fast."

36. Another student, Fan Jin, stated that the Professor was not speaking "slow enough to understand" and that he could not find some listed materials because he had no training in Westlaw.

37. It is not the responsibility of the Adjunct Faculty to train the American Law, International students how to use Westlaw, rather, it is that of the University in another course.

38. Another student, Chaoyai Hou, reported that he could not understand Neeff as he spoke "too quickly."

39. Another student, Yu-Chi Chen, claimed "it was hard to keep up" with the Professor.

40. In the last sixteen years, no other student has complained about the inability to "keep up" with or understand the Professor.

41. One such student, Wenxiao Zhang, went so far as to indicate that she could not understand the Professor's accent; for the record, the Professor has no accent.

42. The report from the Investigation also indicates that students complained that the Professor was "too casual" in his demeanor during the class.

43. The Professor, however, has been teaching with the same demeanor for sixteen years with nothing but praise.

44. The report also states that two unidentified students indicated that they were "frustrated" because the Professor did not use PowerPoint and that as a result, they were unable to "follow" the lecture, likely because they too had a difficult time with English.

45. The Professor has never used PowerPoint for any courses taught, nor has any student ever previously expressed a desire for the Professor to use PowerPoint

46. Another student, the Defendant, Chaoyi Hou stated that one of her friends from Thailand asked the Professor a question about the facts of a case and that the Professor responded as follows:

> Are you from Thailand? I have friends from Thailand.  I can tell by your face.

47. Quite to the contrary, the student had not asked a question.  Instead, while going through the Class List of students provided by the Registrar's Office, the Professor had asked a question regarding a case in the assigned reading and randomly called upon the student from Thailand presumably referenced by the Defendant above. Recognizing the Thai spelling of the student's name, the Professor said, as an introduction, "Are you from Thailand?  I recognize the spelling of your name. Welcome to the class."  The student then went on to respond to the question.

48. Furthermore, currently, both students and faculty in the classroom are required to wear masks.  As such, one cannot even discern the face of another especially

considering the fact that the Professor was situated in a large classroom approximately 30 feet away from the first row of students.  This is substantiated by the E-mail sent to di Robilant on September 17th, emphasizing the difficulty of identifying the pictures provided  of students while wearing a mask.  In sum, while the Professor wholeheartedly submits that he would never make a comment on anybody's face in any situation, nor would there be any reason to, such a commentary would not even be possible.

49. Another student, Xindi Xiao, stated that the Professor seemed ill-prepared for class because he kept referring to his textbook in class.

50. The Professor, however, did not have a textbook with him in class.

51. Overall, it became clear that there was a major problem with the Chinese students' lack of proficiency in English in the class.

52. The depositions of these students will further illuminate their purported concerns as well as thir ability to speak English.

53. There has been an ongoing problem for many years with the students from China's lack of proficiency in English in the American Law program at the Law School.

54. Other members of the Adjunct Faculty have complained to the Professor about the inability to have an effective class with the Chinese students in the American Law Program due to their inability to speak proficient English.

55. The Professor had one Italian-American student go so far as to state that he wanted his money back from the American Law program because his classes were all full of Chinese students who did not speak any English and could not effectively communicate in class, making the entire experience useless and a waste of money.

56. That student also complained that the students from China would simply sit in the back of the classroom and converse in Chinese while ignoring the conversation in class; the Professor has witnessed this as well.

57. Throughout the years of teaching, many other students in the JD and the American Law Program have expressed frustration with the Chines students lack of preparedness, lack of understanding of basic concepts and an inability to speak proficient English, if any English at all.

58. The lack of proficiency in English on behalf of the students from China in the American Law program has negatively affected the overall quality of education.

59. Students from other countries including the US have complained for years about the lack of proficiency of English of the Chinese students in the American Law program at the Law School.

60. The lack of proficiency on behalf of the students from China is disruptive and frustrating to other students and brings down the overall value of the collective learning experience.

61. The lack of proficiency of these students is by no means the fault of the students themselves.

62. Boston University and the Associate Dean, Anna di Robilant and Director Maureen Leo are responsible for this shortcoming in reducing the quality of education at the Law School.

63. These students should not be admitted to the program without a minimum proficiency in English.

64. Upon information and belief, much of the proficiency of many students is overlooked because these students can afford the high tuition at the Law School.

65. The University highly profits from the tuition of these students from China while paying their Adjunct Professors what equates to minimum wage.

66. Adjunct Professors do no teach at the University for grand compensation but for the reward of being involved with the future of every student they meet.

67. Much of the program is motivated by high profit margin.  In that regard, it appears as though the students of China have been able to buy a great deal of influence in BU policy, making unfounded claims toward faculty, condoned and overlooked by the BU Administration in the interest of money.

68. The current annual cost to attend Boston University is almost $77,000 per year including the following:

69. Tuition, $59,380, Books and Supplies, $1,462 ; Student Fees, $1,338, Room and Board, $14,590.

70. The average Adjunct's payment for services, however is approximately $6,000 per semester or about minimum wage considering the work involved.  And, this is only because the Adjunct Faculty has been unionized in recent years.  The Professor did not receive a single raise in compensation for the first 11 years of employment with Boston University.  The Union, Local SEIU negotiated a contract on behalf of the Part-time Faculty ensuring an annual pay increase against the wishes of Boston University.  The Professor even received a call from the Associate Dean of Academic Affairs at the time of negotiation urging him not to agree with unionization. Ultimately, however, contrary to the resistance of Boston University, the Part-time

Faculty was able to join the Union effectuating mandatory pay increases which had not been required or implemented prior.

71. The ultimate problem with the program, however, is that these students are not qualified to practice law in the US upon graduation.

72. Many other international students complain about the students particularly from China, not only because they cannot speak English, but because they are not taught basic principles of American Law in the program.

73. When discussing a case, it is common for a Chinese student to interrupt the class and ask very basic questions, such as, what is discovery? What is a trial court? What is Summary Judgment or a Motion to Dismiss?  What is a Complaint?

74. Such rudimentary questions completely disrupt the class for other students and should be taught before any upper level classes, such as IP in the Digital Age.

75. Boston University attempts to put as many international students as possible in to one of an Adjunct's class in order maximize profits at the expense of the education of the students and additional work of the Adjunct Professor.

76. While the Professor's class, IP in the Digital Age had reached its maximum enrollment of 25 students, Maureen Leo had requested that the Professor accept 15 more students in the class for a total of 40 students.

77. The Professor agreed in the spirit of being accommodating to the students who wanted to join the class but it was determined impracticable because Maureen Leo recognized that it would require additional compensation for the Professor under the union contract.

## COUNT I: NEGLIGENCE AGAINST BOSTON UNIVERSITY

78. The Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

79. The Professor was removed from the IP in the Digital Age class and placed on Suspension/ Leave after only one meeting.

80. Administrative Leave is a measure invoked where a Professor engages in some type of egregious conduct.  The action is meant to be employed where a faculty member poses a physical threat to the safety of a student either by words or actions.  Most examples typically include racial epithets, direct sexual innuendos, threats of violence, sexual harassment and, of course, allegations of any form of assault.

81. The Administration had no reasonable basis to place the Professor on Administrative Leave.

82. The Suspension of the Professor was shocking, abrupt and without any fair notice to the Professor.

83. The Professor never even had a meeting with the Administration prior to the Suspension.

84. In that regard, the Administration failed to follow recognized and published procedure in suspending the Professor.

85. The Administration further failed to conduct the corresponding Investigation of the Professor according to published and recognized procedure.

86. The Investigation consisted of interviewing half the students in the class and was conducted in a manner that failed to meet standard procedure.

87. In fact, the Administration failed to conduct the interviews according to any standard operating procedures due to a lack of training, experience and expertise.

88. Of note, the student who praised the Professor and sought a position with the class as Teacher's Assistant was somehow not interviewed in the Investigation.

89. The Administration was not qualified to conduct such an Investigation, had no experience in conducting such an Investigation and failed to use due care in removing the Professor from the class.

90. Given the gravity and seriousness of placing someone on Suspension/Administrative Leave, the University should have employed an independent committee to determine whether the Suspension was fair, justified and appropriate.

91. For example, di Robilant made the decision to place the Professor on Administrative Leave and was then charged with the duty to determine whether the decision was proper.

92. Di Robilant was effectively charged with assessing the propriety of her own decision.

93. Most Universities have a special committee specifically charged with conducting these types of Investigations; this is standard industry practice.

94. The University has failed to meet standard industry practice in empowering an unqualified Administration to conduct the Professor's Investigation.

95. Frentzen, who co-authored the Memorandum on the Investigation and participated in the Student interviewing process currently works as the Assistant Librarian for Administration at Boston University where she works on planning, management, and assessment of library services, systems, and collections, as well as providing

assistance at the reference desk and teaching legal research to students in the First Year Writing and American Law LLM programs. (Source: bu.edu).

96. Frentzen has an undergraduate degree in Anthropology and a Juris Doctorate in International and Comparative Law.

97. Since Frentzen's graduation from Law School, she has worked as a Law School librarian and a Legal Intern for a law firm.

98. Upon information and belief, she has never practiced law as an Attorney.

99. In fact, Frentzen was still in college when the Professor began teaching at the Law School.

100.    As for teaching experience, she has taught classes on legal research at Boston University and never anything substantive in nature while the Professor has been teaching for sixteen years to over 800 law students, both Juris Doctorate candidates and International Attorneys from over sixty different countries.

101.    Frentzen has no qualifications whatsoever to support her position in making a determination on the Suspension or any Investigation of any Professor at the University, much less that of the current Plaintiff/Professor.

102.    Di Robilant currently serves as the Associate Dean of Academic Affairs at the University

103.    While both di Robilant and Leo have some limited experience in teaching, both, at the time of occurrence, had only been in their respective positions for one year,

104.    Di Robilant and Leo have no background or experience in suspending any Professor or conducting such an Investigation into any Professor.

105.   Di Robilant and Leo had no expertise or qualifications whatsoever to warrant empowering them with the duty and responsibility to conduct the Investigation of the Professor.

106.   Both di Robilant and Leo were new to their respective positions and upon information and belief, never held such a position with like responsibilities previously.

107.   Both di Robilant and Leo, upon information and belief, had no prior experience in conducting Investigations like the one conducted regarding the Professor.

108.   Both di Robilant and Leo were never trained to conduct such an investigation by the University.

109.   The University failed to use due care in appointing and empowering Frentzen to conduct such an Investigation.

110.   The University failed to use due care in empowering di Robilant and Leo to conduct such an Investigation.

111.   The Administration never even conducted an interview with the Professor according to procedure in Suspending the Professor

112.   The University had a duty to the Professor to conduct a fair and just procedure in making a determination on his Suspension.

113.   The University had a duty to the Professor to conduct a fair and just procedure in conducting the Investigation into the Professor.

114.   The University breached that duty to the Professor by allowing individuals to suspend the Professor and conduct an Investigation into the Professor by individuals

without any background, qualifications, experience or and/or expertise in making a determination on any Suspension or conducting such an Investigation.

115.    Suspending a Professor and placing he or she on Administrative Leave has serious ramifications for the reputation and standing of the Professor as well as their future in the profession.

116.    The University should have retained someone with a background and expertise in conducting the Investigation of the Professor.

117.    As a result of the negligence of the University in empowering unqualified and inexperienced individuals to suspend the Professor and conducting the corresponding Investigation, the Professor has been harmed.

WHEREFORE, for the, forgoing reasons, the Defendant seeks damages for all harm caused by the Defendant in its negligence, including, without limitation, all emotional distress, mental anguish and humiliation and Attorney's Fees and whatever this Court may deem just and proper.

## COUNT II: DEFAMATION AGAINST THE DEFENDANTS, BOSTON UNIVERSITY

## AND CHAOYI HOU

118.    The Administration failed to use due care in conducting the Investigation in the way in which the students were interviewed causing the Professor to be defamed.

119.    The Investigation following the Professor's removal was performed in such a manner that the interviews with the students resulted in harming the reputation of the Professor.

120.   The interviews of the students were not conducted according to any standard operating procedures resulting in harming the Professor's standing in the community.

121.   The lack of background, experience and expertise of the Administration in conducting the Investigation resulted in damaging the reputation and standing of the Professor.

122.   Suspension and/or Administrative Leave is a measure invoked where a Professor engages in some type of egregious conduct.   The action is meant to be employed where a faculty member poses a physical threat to the safety of a student either by words or actions.   Most examples typically include racial epithets, direct sexual innuendos, threats of violence, sexual harassment and, of course, allegations of any form of assault.

123.   Claims of tardiness and a student's apparent disapproval of faculty attire, along with allegations of being incapable of understanding the Professor, when there had never been any complaints regarding the same in the last sixteen years, clearly did not warrant the action taken by Boston University and the Administration in removing the Professor from the class.

124.   The primary problem here is clear; once again, Boston University and Associate Dean Leo admitted students to the program who could not proficiently speak English.

125.   After all the time spent on the Investigation, none of the students had any complaint that justified placing the Professor on Leave/ Suspension.

126.   The manner in which the Administration at BU conducted the Investigation was also completely selective and improper and calculated to justify the wrongful Suspension/Termination of the Professor.

127.    The Investigation as conducted, was clearly defamatory and greatly harmed the reputation and standing of the Professor and has indelibly damaged his professional career.

128.    The inquiries conducted with the students of the Professor during the Investigation constituted defamatory communications, casting the Professor in a false and defamatory light and thereby damaging his reputation.

129.    Following the Suspension of the Professor, the Administration provided an explanation for his removal from class to the students that was defamatory causing the Professor damage to his reputation and standing in his community.

130.    These very communications by the Administration to the students both during the interviews and following his removal from class were defamatory in nature and detrimentally affected his business and profession.

140.    The Defendant, Chaoyi Hou stated that one of her friends from Thailand asked the Professor a question about the facts of a case and that the Professor responded as follows:

Are you from Thailand? I have friends from Thailand.  I can tell by your face.

141.    Quite to the contrary, the student had not asked a question.  Instead, while going through the Class List of students provided by the Registrar's Office, the Professor had asked a question regarding a case in the assigned reading and randomly called upon the student from Thailand presumably referenced by the Defendant above.  Recognizing the Thai spelling of the student's name, the Professor said, as an introduction, "Are you from Thailand?  I recognize the

spelling of your name.  Welcome to the class."  The student then went on to respond to the question.

142.   Furthermore, currently, both students and faculty in the classroom are required to wear masks.  As such, one cannot even discern the face of another especially considering the fact that the Professor was situated in a large classroom approximately 30 feet away from the first row of students.  This is substantiated by the E-mail sent to Di Robilant on September 17th, emphasizing the difficulty of identifying the pictures provided of students while wearing a mask.  In sum, while the Professor wholeheartedly submits that he would never make a comment on anybody's face in any situation, nor would there be any reason to, such a commentary would not even be possible.

143.   The Professor's ex-wife and lifelong friend is Thai American who he had met at Boston University.

144.   A such, the Professor knows a great deal about Thai culture and even speaks some of the language.

145.   The Professor was together with his ex-wife for seven years during which they faced a multitude of prejudice and discrimination due to the interracial nature status of their relationship.

146.   As such, the Professor took particular offense to the Defendant making this false and defamatory statement to his employer.

147.   The Defendant, Chaoyi Hou's comments were absolutely incorrect, terribly offensive and patently defamatory.

148.    The Defendant, Chaoyi Hou's comments painted the Professor as a racist in the eyes of his employer and had an adverse affect on his position of employment with the University as well as his reputation and standing in the community.

149.    The Defendant, Chaoyi Hou, by making such a false and defamatory statement to the Professor's employer, clearly constitutes defamation, per se.

150.    In the Investigation Memorandum provided by The Defendants, Boston University failed to investigate the truth of these comments and thereby endorsed them.

151.    Boston University had access to the video recording of the class in question and could have easily dispelled the truth of the Defendant, Hou's allegation.  Instead, Boston University also used these false statements to further embarrass and humiliate the Professor.

152.    Boston University also used these false statements to embarrass, humiliate and deter the Professor from pursuing the claims set forth in this Complaint.  By endorsing these false comments and failing to investigate them further, Boston University engaged in the same false and defamatory conduct as the Defendant, Hou.

153.    By endorsing these false comments and failing to investigate them further, Boston University has unduly and indelibly harmed the Professor, his reputation, profession, career, future and reputation and standing in the community.

154.    The communications made by Boston University and the Administration to the students in the IP in the Digital Age class both during the Investigation and following the Professor's removal from the class were defamatory.

155.    The defamatory communications made by Boston University and the Administration to the students in the IP in the Digital Age class both during the Investigation and following the Professor's removal from the class were made intentionally and/or negligently.

156.    The defamatory communications made by Boston University and the Administration to the students in the IP in the Digital Age class both during the Investigation and following the Professor's removal from the class caused the Professor harm to his reputation and standing in the community and to his business and profession.

157.    The communications made by Boston University and the Administration to the students in the IP in the Digital Age class both during the Investigation and following the Professor's removal from the class constituted defamation "per se".

158.    The communications made by Hou to the Professor's employer, Boston University, were false and defamatory.

159.    The communications made by Hou to the Professor's employer, Boston University, caused the Professor harm in detrimentally affecting his business and profession, his employment and his reputation and standing in the community.

160.    The communications made by Hou to the Professor's employer, Boston University, constituted defamation "per se".

WHEREFORE, for the, forgoing reasons, the Professor seeks damages for all harm caused by the Defendants in defaming the Plaintiff including, without limitation, all emotional distress, mental anguish and humiliation and Attorney's Fees and whatever this Court may deem just and proper.

## COUNT III: WRONGFUL TERMINATION/ UNLAWFUL RETALIATION

### AGAINST BOSTON UNIVERSITY

161.    The Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

162.    The Investigation directed by the Administration was conducted in a bias manner, in that, the Administration selectively interviewed certain students in the Investigation process.

163. The student referenced above, Abdulrahman (last name omitted), praising the class and suggesting that others greatly enjoyed it as well was never interviewed in the Investigation process despite the fact that he had requested information as to how he could become a Teacher's Assistant in the IP in the Digital Age class while explaining how much other students enjoyed the class.

164.    Director Leo was well aware of this student's request as the Professor immediately forwarded that E-mail correspondence to Director Leo asking for instructions on how he could direct the student for a Teacher's Assistant position.

165.    Maureen Leo never responded to that request.

166.    Moreover, 12 students were not a part of the Investigation Process.

167.    As such, the entire Investigation was tainted by bias and a retaliatory motive relating back to a prior semester of teaching.

168.    Given the frivolous nature of the alleged complaints by the students, the Administration clearly used these complaints as a way in which to retaliate against the Professor.

169.    The BU Administration was very upset about the Professor's inability to attend class "in-person" during the initial covid pandemic and implicitly threatened termination for those Adjuncts who refused to attend class "in-person".

170.    During the Fall of 2020 when the Professor taught Entertainment Law at the University, the Administration at the University demanded that all Adjuncts teach "in-person" at the University despite the fact that the Dean of the School of Health at the University had formally stated that it was "inconceivable" that anyone be in class during the pandemic.

171.    The Professor presented a Doctor's note to the Administration, Professor Stacie Dogan, then Associate Dean of Academic Affairs, confirming a disability which prevented him from wearing a mask, thereby requesting an accommodation for his disability.

172.    The Administration at the University was extremely dismayed that the Professor would not be teaching "in-person" for the semester in the Fall of 2020, as it was trying to create a reputation for being the only Law School in the US continuing a policy of "in-person" classes during the pandemic.

173.    Continuing to have Adjunct Faculty teaching in class and creating a reputation for continuing to have said Faculty 'in-person" justified the University's ability to continue to raise tuition.

174.   Boston University had a financial motive to represent to the public at large that despite other Universities well-founded reservations, Boston University would continue to have their Adjunct Faculty teaching live and in the classroom.

175.   As a result of seeking an accommodation due to the Professor's disability, Boston University and its Administration Defendants, Associate Dean di Robilant, Assistant Dean Frentzen and Director Leo, have now retaliated against the Professor in relegating him to Administrative Leave/Suspension.

176.   Stripping the Professor of his duties and responsibilities at the University and relegating him to suspended status was, in fact, the equivalent of termination.

177.   The Suspension of the Professor was retaliation for his seeking an accommodation for his disability in the prior year.

178.   Placing the Professor on Administrative Leave/Suspension, constituted a materially adverse employment action and violated the terms and conditions of his employment with Boston University.

179.   Placing the Professor on Administrative Leave/Suspension because of his request for an accommodation due to his disability constituted unlawful retaliation and/or wrongful termination of his employment with Boston University.

180.   Boston University used the frivolous Complaints (i.e. inappropriate attire and tardiness) allegedly made by the students from China to justify the Placement of the Professor on Leave/Suspension.

181.    The alleged insignificant complaints supporting the initial reasoning for the Suspension (i.e., inappropriate attire and tardiness), were nothing more than a pretext for the initial placement of the Professor on Leave/Suspension and were never repeated again by the students during the Investigation process.

182.    The initial reasoning for placing the Professor on Leave/Suspension was nothing more than a pretext for the retaliation by Boston University and the Defendants, Associate Dean di Robilant, Assistant Dean Frentzen and Director Leo.

183.    Further, the defective and biased Investigation failed to meet any standard of acceptable professional practice, such that, the Investigation was in and of itself, invalid.

184.    This invalid Investigation effectuated the adverse employment decision made by the BU Administration, Defendants, Associate Dean di Robilant, Assistant Dean Frentzen and Director Leo and resulted in the wrongful and retaliatory termination of the Professor.

WHEREFORE, for the forgoing reasons, the Professor seeks damages for all harm caused by the Defendants in its Wrongful and Retaliatory Termination of the Plaintiff, including, without limitation, all emotional distress, mental anguish and humiliation and Attorney's Fees and whatever this Court may deem just and proper.

## COUNT IV: INVASION OF PRIVACY AGAINST BOSTON UNIVERSITY

185.    The Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

186.    The reasons provided by the Administration for placing the Professor on Leave/Suspension (i.e. alleged inappropriate attire and tardiness) were not adequate to commence an Investigation into the Professor.

187.    The Suspension and corresponding Investigation into the Professor was unwarranted and unjustifiable and due to the University's empowering of unqualified persons, that being the Administration, to implement the Suspension and conduct the Investigation of the Professor.

188.    The University failed to use due care in empowering the Administration, without the proper qualifications or training, to conduct the Investigation into the Professor and was negligent in its actions.

189.    The Administration failed to meet the minimum procedural standards required before placing the Professor on Leave/Suspension including, without limitation, at a minimum, a meeting between the Professor and the Administration and, thus had no right or justification for initiating an Investigation into the Professor.

190.    The commencement of the Investigation without justifiable reasoning violated the rights of the Professor.

191.    The lack of background, experience and expertise of the Administration in suspending and conducting the Investigation of the Professor and the corresponding Administration's failure in judgment in conducting the same led to an unreasonable, substantial and serious interference with his privacy.

192.    The University's failure to use due care in empowering the Administration to suspend and conduct the Investigation of the Professor caused the Professor harm by substantially and unreasonable intruding in his right to privacy.

193.    The negligent Investigation, particularly including the interviews conducted by the Boston University Administration, Defendants, di Robilant, Frentzan and Leo without the Professor's consent and without proper justification, constituted an unjustifiable intrusion into his personal life.

194.    The negligent Investigation, particularly including the interviews conducted by the Boston University Administration, Defendants, di Robilant, Frentzan and Leo without the Professor's consent constituted an unreasonable, substantial and serious interference with his privacy.

195.    The negligent Investigation, particularly including the interviews conducted by the Boston University Administration, Defendants, di Robilant, Frentzan and Leo without the Professor's consent constituted an unreasonable, substantial or serious interference with his privacy caused the Professor undue emotional distress, embarrassment and humiliation and has indelibly harmed the Professor.

WHEREFORE, for the forgoing reasons, the Professor seeks damages for all harm caused by the Defendant in violating his Right of Privacy including, without limitation, all emotional distress, mental anguish and humiliation and Attorney's Fees and whatever this Court may deem just and proper.

## COUNT V: VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT

### AGAINST BU AND BURGESS

196.    The Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

197.    Following the conclusion of the Investigation, the Defendants, Boston University and Director Burgess stated as some form of negotiation between the parties that they would not dispute the Professor's right to unemployment if he would sign an agreement to release all claims he currently has against the Defendants and may have in the future.

198.    The Defendant, Burgess, a self-proclaimed champion of civil rights, made this direct proposal on her own volition far outside the scope of her employment duties and responsibilities as Director of Labor Relations.

199.    The proposal made by the Defendants, Burgess and Boston University, constituted an attempt to interfere with the Professor's right to unemployment benefits, a right secured by the laws of the Commonwealth of Massachusetts, by threatening, intimidating and attempting to coerce the Professor to sign a release of legal claims against the Defendants.

200.    The proposal made by the Defendants, Burgess and Boston University was unethical, undignified and immoral in attempting to threaten and intimidate the Professor into waiving his valid claims against the University in order to receive a benefit provided by the Commonwealth of Massachusetts, one which has been paid into for 16 years while teaching as an Adjunct at the University.

201.    This proposal made by the Defendants violated the Massachusetts Civil Rights Act.

202.    The proposal made by the Defendants, Burgess and Boston University have harmed the Professor in causing him undue emotional stress and humiliation.

WHEREFORE, for the forgoing reasons, the Professor seeks damages for all harm caused by the Defendants in violating the Massachusetts Civil Rights Act including, without limitation, all emotional distress, mental anguish and humiliation and Attorney's Fees and whatever this Court may deem just and proper.

## COUNT VI: PLAGAIARISM AGAINST BU

203. On April 4, 2022, BU posted a job opening on LinkedIn for a Part-time Lecturer in Entertainment Law.

204. That posting published by BU is a verbatim copy of the Plaintiff's Course Description which the Plaintiff created and developed through many years of hard work.  (The Plaintiff retains a screenshot of the Plaintiff's Course Description published by BU and falsely passed off as a creation by BU).

205. That course Description is a proprietary creation of the Plaintiff and constitutes a work created by the Plaintiff over many years of hard work and development.

206. The publication provided by BU on LinkedIn constitutes plagiarism by BU and an infringement of the work created by the Plaintiff.

WHEREFORE, for the foregoing reasons, Plaintiff seeks damages for all harm caused by the Defendant's plagiarism of the Plaintiff's work as well as all Attorney's fees and costs incurred in pursuing this claim.

36

## COUNT VII: INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

207.    The Plaintiff restates and realleges all preceding paragraphs as if fully set forth herein.

208. The aforementioned conduct of the Defendants were extreme and outrageous.

209. The aforementioned conduct of the Defendants were committed intentionally, recklessly and/or negligently.

210. As a result of the aforementioned conduct committed by the Defendants, the Plaintiff has suffered severe emotional distress.

WHEREFORE, for the foregoing reasons, the Plaintiff seeks damages for all such harm caused by the Defendants in causing such emotional distress as well as all Attorney's fees and costs as well as that which this Court may deem just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury on all Counts set forth in this Complaint.


Respectfully submitted,
Plaintiff,

Jerrold G. Neeff
The Bostonian Law Group
509 Beacon St, Apt. No. 1
Boston, MA 02215
BBO No. 635307
(617) 312-4904
Jerry@Bostonianlaw.com


Dated: July 12, 2022

## COUNTY OF SUFFOLK
## SUPERIOR COURT

| | | |
|---|---|---|
| PLAINTIFF, | ) | |
| JERROLD G. NEEFF, | ) | |
| A natural person and | ) | **2284cv00472** |
| Massachusetts resident. | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| DEFENDANTS, | ) | |
| BOSTON UNIVERSITY | ) | |
| A Massachusetts Corporation. | ) | |
| | ) | |
| AND, | ) | |
| | ) | |
| JUDITRA BURGESS, | ) | |
| A Massachusetts resident and | ) | |
| Employee of Boston University, | ) | |
| | ) | |
| AND, | ) | |
| | ) | |
| CHAOYI HOU, | ) | |
| A current Massachusetts resident. | ) | |

### PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS

Pursuant to F.R.C.P. 36, Plaintiff hereby serves this Request for Admissions upon the Defendant, Boston University.  Defendant is required to either admit or deny the truth as to the below Requests within thirty (30) days of service pursuant to F.R.C.P 36.

### DEFINITIONS

References to the term "the Investigation" and/or "the Suspension" shall mean the Investigation conducted by Boston University as so detailed in a Memorandum dated October 15, 2021, regarding the Plaintiff.

References to the term "BU" shall mean the School of Law at the University popularly known as "Boston University" whose business address is located at 765 Commonwealth Ave., Boston, MA 02215.

References to the term "Administrative Leave Investigations" shall mean those type of Investigations as were so conducted regarding the Plaintiff as detailed in the Memorandum dated October 15, 2021regarding the Plaintiff's Investigation conducted by employees of BU.

References to the term "Investigations pursuant to Administrative Leave" refer to the type of Investigation that was conducted regarding the Plaintiff which resulted in the Memorandum dated October 15, 2021 concerning the Plaintiff's Suspension.

<u>INSTRUCTIONS</u>

1. In response to each request for admission, you shall admit the matter in question, specifically deny the matter, or set forth in detail the reasons why you cannot truthfully admit or deny the matter.

2. If you deny any request for admission, the denial shall fairly meet the substance of the requested admission and when good faith requires that you qualify an answer or deny only a part of the matter of which an admission is requested, you shall specify so much of it as is true and qualify or deny the remainder.

3. The fact that a matter of which an admission is requested presents a genuine issue for trial is not grounds for objecting to the request for admission.

4. If you assert a claim of privilege or work product in responding or objecting to any request for admission, and information is not provided on the basis of such assertion: a. identify the nature of the privilege asserted; b. if the privilege is being asserted in connection with a claim or defense governed by state law, set forth the state privilege rule being invoked; c. with respect to the information requested, state whether any documents exist; and d. with respect to the information requested, state whether any oral communications took place.

5. You shall timely supplement your answers to these requests for admissions when relevant.

<u>REQUESTS FOR ADMISSION PURSUANT TO F.R.C.P. 36</u>

1. Anna di Robilant served as Associate Dean of Academic Affairs at BU at the time of conducting the Administrative Leave Investigation of the Plaintiff.

   ANSWER:

2. Anna di Robilant (hereinafter "Anna") has never held the position of Associate Dean of Academic Affairs at any other Law School in the United States prior to assuming the position at the School of Law at BU.

   ANSWER:

3. Anna held the position of Associate Dean of Academic Affairs at the School of Law at BU at the time of the Plaintiff's Suspension.

ANSWER:

4. Anna has held her position as Associate Dean of Academic Affairs at BU for a little more than a year.

   ANSWER:

5. Anna had never placed a Professor at BU, Adjunct or otherwise on Administrative Leave prior to the Plaintiff in this Action.

   ANSWER:

6. Anna had never conducted an Investigation of a Professor pursuant to Administrative Leave prior to the Investigation conducted concerning the Plaintiff in this Action.

   ANSWER:

7. Anna had never conducted an Investigation of a Professor pursuant to Administrative Leave at any other Law School in the United States prior to the Investigation conducted concerning the Plaintiff in this Action.

   ANSWER:

8. Anna has had no background in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

   ANSWER:

9. Anna has had no training in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

   ANSWER:

10. Anna has no experience in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

    ANSWER:

11. Anna has had no training as an employee of BU in conducting Administrative Leave Investigations.

    ANSWER:

12. BU provided no training for Anna in conducting an Investigation pursuant to Administrative Leave prior to the Investigation conducted regarding the Plaintiff in this Action.

ANSWER:

13. The position of Associated Dean of Academic Affairs at the School of Law requires a candidate with experience in conducting and Administrative Leave Investigation.

ANSWER:

14. BU is required to provide training for particular employees at BU to conduct such Administrative Leave Investigations.

ANSWER:

15. BU is required to provide training for the Associate Dean of Academic Affairs at BU to conduct an Administrative Leave Investigation.

ANSWER:

16. Maureen Leo is the Director of the American Law Program at BU.

ANSWER:

17. At the time of the Investigation, Maureen Leo (hereinafter "Leo") held the Position of Director of the American Law Program.

ANSWER:

18. At the time of the Investigation, Leo was new to the position of Director of the American Law Program.

ANSWER:

19. Prior to Leo's appointment to the position of Director of the American Law Program, Leo never held the position of Director at any other Law School program in the United States.

ANSWER:

20. Leo currently holds the position of Director of the American Law Program at the School of Law at BU.

ANSWER:

21. Leo has held her current position as Director of the American Law Program for a little more than a year.

ANSWER:

22. Leo has never placed a Professor at BU, Adjunct or otherwise on Administrative Leave prior to the Plaintiff's Suspension in this Action.

ANSWER:

23. Leo has never conducted an Investigation of a Professor pursuant to Administrative Leave prior to the Investigation conducted concerning the Plaintiff in this Action.

ANSWER:

24. Leo has never conducted an Investigation of a Professor pursuant to Administrative Leave at any other Law School in the United States prior to the Investigation conducted concerning the Plaintiff in this Action.

ANSWER:

25. Leo has had no background in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

26. Leo has had no training in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

27. Leo had no experience in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

28. Leo has had no training as an employee of BU in conducting Administrative Leave Investigations.

ANSWER:

29. BU provided no training for Leo in conducting an Investigation pursuant to Administrative Leave prior to the Investigation conducted regarding the Plaintiff in this Action.

ANSWER:

30. The position of Director of the American Law Program at the School of Law requires a candidate with experience in conducting an Administrative Leave Investigation.

ANSWER:

31. Leo has a compensation package as an employee of BU which is affected by the amount of students that enroll in the American Law Program.

ANSWER:

32. Leo's compensation at BU is affected by the amount of students enrolled in the American Law Program.

ANSWER:

33. Increased student enrollment in the American Law Program, increases Leo's compensation package as an employee at BU.

ANSWER:

34. BU is required to provide training for the Director of the American Law Program at BU to conduct an Administrative Leave Investigation.

ANSWER:

35. Ellen Frentzen (hereinafter "Ellen") is an Assistant Dean for Administration at the School of Law at BU.

ANSWER:

36. Ellen is an Assistant Librarian for Administration at BU.

ANSWER:

37. Ellen Teaches Legal Research to First Year students in the Legal Writing Program and students in the American Law LLM program.

ANSWER:

38. Ellen has no experience in teaching any substantive courses at BU other than that in the Legal Writing Program.

ANSWER:

39. Ellen has no experience in teaching any courses at BU other than Legal Research.

ANSWER:

40. Ellen has never been involved in conducting an Administrative Leave Investigation of a Professor at BU, Adjunct or otherwise prior to the Plaintiff in this Action.

ANSWER:

41. Ellen has never conducted an Investigation of a Professor pursuant to Administrative Leave prior to the Investigation conducted concerning the Plaintiff in this Action.

ANSWER:

42. Ellen has never conducted an Investigation of a Professor pursuant to Administrative Leave at any other Law School in the United States prior to the Investigation conducted concerning the Plaintiff in this Action.

ANSWER:

43. Ellen has had no background in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

44. Ellen has had no training in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

45. Ellen had no experience in conducting Investigations pursuant to Administrative Leave prior to conducting the Investigation of the Plaintiff in this Action.

ANSWER:

46. Ellen has had no training as an employee of BU in conducting Administrative Leave Investigations.

ANSWER:

47. BU provided no training for Ellen in conducting an Investigation pursuant to Administrative Leave prior to the Investigation conducted regarding the Plaintiff in this Action.

ANSWER:

48. The position of Director of Assistant Dean for Administration at BU requires a candidate with experience in conducting and Administrative Leave Investigation.

ANSWER:

49. BU provided training for Ellen in conducting an Administrative Leave Investigation prior to that conducted concerning the Plaintiff in October, 2021.

ANSWER:

50. Ellen has the authority hire and/or terminate Adjunct Faculty at BU.

Administrative Leave.

51. In September of 2021, the Plaintiff was placed on Administrative Leave after having only taught one class in the class entitled "Intellectual Property in the Digital Age."

ANSWER:

52. Students at BU have the authority to determine what attire is appropriate for an Adjunct Professor at BU.

ANSWER:

53. If a student disapproves of the attire of a Professor at BU, this could be grounds for placing the Professor on Administrative Leave.

ANSWER:

54. A student's complaint about the attire of a Professor at BU is considered valid justification to place a Professor on Administrative Leave.

ANSWER:

55. At the time of placing the Plaintiff on Administrative Leave, there was no mention of what attire is appropriate for an Adjunct Professor in the collective Bargaining Agreement negotiated between the Adjunct Faculty and BU.

    ANSWER:

56. Being one minute late to the first day of class at BU is justifiable grounds for a Professor to be put on Administrative Leave.

    ANSWER:

57. A student's complaint that the student found the Professor's behaviour to be "too casual" as referenced in the Memorandum issued by BU dated October 15, 2021 is valid justification to place a Professor on Administrative Leave.

    ANSWER:

58. Prior to the first class of "IP in the Digital Age", the Plaintiff had no formal complaints by a student at BU other than the issue of a mask in class in Entertainment Law in 2020.

    ANSWER:

59. In the Plaintiff's 15 years at BU and prior to his first class "IP in the Digital Age", the Plaintiff had no formal complaints by a student at BU other than the issue of a mask in class in Entertainment Law in 2020.

    ANSWER:

60. Prior to teaching during the pandemic at BU in 2020, the Plaintiff had very good reviews by his students at BU.

    ANSWER:

61. The majority of the students in the "IP in the Digital Age" class at BU at issue in the case were from China.

    ANSWER:

62. Employees of BU listed in the Memorandum dated October 15, 2021 interviewed 14 students in the "IP in the Digital Age" class.

    ANSWER:

63. The majority of the students interviewed reflected in the Memorandum dated October 15, 2021 are from China.

    ANSWER:

64. The 'IP in the Digital Age" class at issue in this case had at least 23 students enrolled.

    ANSWER:

65. Prior to the Plaintiff's teaching the first and only class in the "IP in the Digital Age" class, there had never been any complaints from any students regarding a difficulty understanding the Plaintiff.

ANSWER:

66. The students from China in the Plaintiff's class entitled "IP in the Digital Age" were required to take an English equivalency exam for admission into the American Law Program.

ANSWER:

67. A student's complaint that the student found the Professor's behaviour to be "too casual" as referenced in the memorandum dated October 15, 2021, is valid justification to place a Professor on Administrative Leave.

ANSWER:

68. The majority of the students in the IP in the Digital Age class at BU at issue in the case were from China.

ANSWER:

69. BU retains the video of the class at issue in this case from which the Plaintiff was placed on Suspension.

ANSWER:

70. The students so listed in the Memorandum dated October 15, 2021 currently reside in Massachusetts and are available for deposition.

ANSWER:

71. More than fifty percent of the American Law Program consists of students originally from China.

ANSWER:

72. The Defendant in this Action, Chaoyi Hou, is a current resident of Massachusetts.

ANSWER:

73. The defendant in this Action, Chaoyi Hou, is a current student in the American Law Program.

ANSWER:

74. BU requested permission from the students interviewed referred to in the Memorandum dated October 15, 2021 to release their names to the Plaintiff.

ANSWER:

75. BU requested a release from the students interviewed referred to in the Memorandum dated October 15, 2021 to use the their names in said Memorandum.

ANSWER:

76. The students interviewed referred to in the Memorandum dated October 15, 2021 were made aware that their names would be used in said Memorandum.

ANSWER:

Respectfully submitted,
Plaintiff,

Jerrold G. Neeff
The Bostonian Law Group
509 Beacon St, Apt. No. 1
Boston, MA 02215
BBO No. 635307
(617) 312-4904
Jerry@Bostonianlaw.com

## CERTIFICATE OF SERVICE

I, JERROLD G. NEEFF, do hereby certify that a true and accurate copy of this document was served upon the Defendant, Boston University, on the date so set forth on the Return of Service attested to by the Process Server in this matter as this document was served with the Complaint.  Said Return of Service shall be submitted to the Court.

JERROLD G. NEEFF

**2284CV00472**

Stephen Kerr, Esq.
Boston University
Off of the General Counsel
125 Bay State Road
Boston, MA 02215

NOTIFY

7

## COUNTY OF SUFFOLK
## SUPERIOR COURT

PLAINTIFF,                          )
JERROLD G. NEEFF,                   )
A natural person and                )
Massachusetts resident.             )
                                    )
                                    )
VS.                                 )
                                    )
                                    )           22-CV-472 – *H*
DEFENDANTS,                         )
BOSTON UNIVERSITY                   )
A Massachusetts Corporation.        )
                                    )
AND,                                )
                                    )
                                    )
JUDITRA BURGESS,                    )
A Massachusetts resident and        )
Employee of Boston University,      )
                                    )
AND,                                )
                                    )
                                    )
CHAOYI HOU,                         )
A current Massachusetts resident.   )

---

### PLAINTIFF'S MOTION TO EXTEND TIME TO EFFECTUATE SERVICE OF PROCESS UPON THE DEFENDANT, CHAOYI HOU

NOW COMES THE PLAINTIFF and hereby requests that this court extend the time to

effectuate service of process upon the Defendant CHAOYI HOU for a period of sixty days.  In

support of this Motion, the Plaintiff provides the following:

To date, the Defendants BOSTON UNIVERSITY and JUDITRA BURGESS have been

served with the Amended Complaint in this matter as so confirmed by the Proof of Service

Certificates filed with this Court, an Answer to which is due by both parties on August 5th, 2022.

49